Good morning. John Hook for Amco Appellant. I'd like to reserve five minutes for rebuttal. In this case, basically, we're asking for two things. One, we're asking for the court to grant an additure, because the standard for granting an additure is that when liability is established and there is no dispute over damages, there's no reason why the person asserting the claim should not get the damages that were not disputed. And if the jury does not grant that, for whatever reason the court does not grant it, there should be an additure. Can I back up just a little bit? Sure. Can you point, I guess, to what evidence in the record supports the jury's damages award? What supports the jury's damages award? None. In other words, there is no evidence in the record that supports the jury's damages award. I mean, just the 43, where they get $43,900 is a mystery. There's absolutely no evidence that would support that award. Is it possible they mitigated the damages? Well, there was no evidence that there was any mitigation. I mean, this was a fire that destroyed the building. And I guess mitigation of damages, I'm not sure how you would mitigate a damage which destroyed the building. If there was some evidence that they could have done something to our client, could have done something to make the damage less, that would be a mitigation of damages. If they didn't call the fire department or something. But there was no evidence that there was anything they could have done to mitigate the damages. So I don't think the mitigation really, if there's any evidence of that. The evidence that the opposing counsel points to is when the insurance adjuster, Rossler, was on the stand, there was a question by Eureka, did you inquire into how the subcontractors estimated the costs, the replacement repair costs? And she said, no, I didn't. That was the only thing I saw that they pointed to. Well, that was the only thing that they pointed to. And I don't think it really is very meaningful because the adjuster in coming up with the damage figure paid her policy limits. In other words, she came up with a figure of $723,000 by various means. And she only paid $68,900. The policy limit, she only paid what the policy limit allowed her to pay. So that question really didn't mean anything. And particularly, she — I guess, are we talking about additors or are we talking about new trials here? Pardon? If we're talking about additors. Oh, okay. The additor is a different issue, Your Honor. Okay. So you're talking about whether there's anything to sustain the jury's verdict and the new trial issue? Is that where you are now? Well, that — I was replying to the question, which I assume was addressed at the new trial issue. There's a completely separate issue as to whether additors should be granted. And basically — Well, that's why I wanted to kind of understand what you were really addressing here. Right. Well, I was — I mean, I frankly don't see why you're here about additors. There's no question the jury was told they had to collect and determine what the damages were. There's no question that there was cross-examination about whether the damages that you suggest were the damages or really the damages. So I guess I'm having a tough time understanding, given the jury had to determine what the damages were, and you didn't say, hey, there's no evidence against it. You should give us damages if there's liability. Move for judgment. The jury had to determine it, and there was cross-examination about it. Well, Your Honor — As far as I'm concerned, that ends any additor issue. Well, Your Honor, it ends the additor issue if there was a dispute. There was no dispute. It seems to me there must have been a dispute because the jury was asked what to determine, and there was cross-examination about your computation of it. But the cross-examination didn't — I mean, just because they don't put on damages, their own estimation of damages, doesn't suggest that they're not disputing damages. Sometimes defense lawyers don't put on any estimation of damages because they don't think you deserve any. So they cross-examine your computation thereof, and it goes to the jury. And then we can't give additors. Well, Your Honor, that would be true if there was some evidence that they had that the damages were something less than what — But just a minute. Again, there is no need for counsel to present some evidence of damage. They can say no damage and give no evidence. All they have to do is cross-examine the damage as a witness that you have and put damages on the jury verdict form, and damages is an issue. An additor is over. Well, Your Honor, the question is, was there a dispute? And the question that I have, what was the dispute? In other words, the fact that they cross-examine a witness doesn't mean — I mean, they cross-examine the witness. One of the cross-examination questions, well, how many — how many employees did AMCO have? Well, does that mean that they ask that question, that that means that they're disputing damages? The question that they asked with regard to the dispute doesn't suggest, or the answer doesn't suggest something less than the amount that she came up with. In other words, there was nothing to suggest that because she had about three or four different factors that she used to come up with her figure. One of the factors was the $723,000, but that was way above what she actually paid. Her opinion was that it would cost more to rebuild the building than it would be for her policy limits. That's what she — that's what the — I mean, I even look at you and I hear your argument. I hear what you're saying, but I've been in the courtroom a lot of times. It doesn't seem to me that if I dispute damages, I can dispute damages based on any way I want to do it. One may be the credibility of the witness who's on the stand. One may be to question what it is that the witness is even talking about. One is to question some of the facts that they're coming up with to get to the conclusion. And then you put that on the jury verdict. If the damages is disputed, additor is out. That's true. My worry is I can't read this record and say damages was not disputed. They cross-examined. You let the jury decide what the damages were. In fact, if I move to the next issue, I have no way to determine. Well, Your Honor — No way to determine that the repair is only $43,900. So, I mean, I think your better issue is the new trial issue. Well, Your Honor, that's our secondary issue. But there's no way we could move for the court to enter a verdict for the damages that weren't disputed because there's still the liability issue that had to be decided. So we couldn't tell the court, well, you have to tell the jury it's this amount, even though the other side never said a word about it. And the cross-examination didn't lead to any — in other words, the question goes back, what is a dispute over damages? A dispute over damages means it's something other than what you're claiming. So some of the cases that you cited from out-of-circuit cases suggests that using a summary judgment standard. So if there's no genuine issue of material fact as to the amount of damages, then the court can apply the additive remedy. But we haven't adopted that approach, have we? Well, I think the cases say that if there's no dispute, if liability is established and there's no dispute over damages, the court can bring its additive. But Dipinta, which is our case, suggests that the no dispute means that the other side consents or agrees to the damages. Well, there's nothing that I saw in any of the cases say that there has to be agreement. In other words, there has to be no dispute. And the question is, what do you mean by dispute? We think dispute means there has to be some contention by one of the sides that what you're asking for is not correct. It's some other figure. That's what the dispute is. Otherwise, we don't think there's a dispute. If you just say, oh, yeah, we dispute damage, they disputed damages because they said, well, we're not liable. Is that a dispute? You know, they're disputing. Doesn't Dipinto say damages are only not in dispute when both parties have consented to additives? Well, that can be true also. I mean, there could be no dispute because there are going to be agreement, but there can be no dispute because nobody's ---- Well, Dipinto is worried about a Seventh Amendment issue. And said, if the court just adds damages where the jury hasn't decided and the other side doesn't agree, then there's a Seventh Amendment, potential Seventh Amendment violation. So it seems like we're bound by Dipinto. Well, but I don't think Dipinto requires that there be an agreement. I mean, if there's no ---- of course, if there's agreement, then there's no dispute. But if the other side says nothing about it and they don't do anything, it seems to me that that's no dispute. If you don't say that damages are something less than what we say they are, I think that ---- Let me move to the new trial issue. And your argument was you should have a new trial and only on the damages. That's correct. But to the extent there was a compromise verdict so that the jury thought it was a close case, that Eureka's liability was questionable, don't we have to send it back for a new trial on ---- There was a compromise. Assuming that we do it at all for both liability and damages? That's correct, Your Honor, if there was a compromise verdict. But we don't believe that there was a compromise verdict just because of the fact that the jury came in first after deliberations. They came in with a unanimous verdict on liability. Then they went to the question of damages. And the notes indicate that they reached the issue of liability first. Then they went to the issue of damages. But they were worried about who was going to pay. And they didn't think Eureka was very liable. I mean, they thought that the fry basket manufacturer had the bulk of the liability. That's correct, Your Honor. The jury obviously didn't follow the verdict that there's joint and several liability. In other words, it doesn't make any difference if somebody is only 10 percent liable. They're still liable for the whole thing. We think the jury just didn't like that. It happens to be California law. But we think the jury just didn't follow that law. That's why they came up with some wild figure that nobody could figure out how they came up with. But we think that it's very clear that that's how that's what the problem was. There's no indication even counsel on the other side says that we're not claiming that there was a compromise verdict. We don't think there was a compromise verdict. We think it's very clear the jury simply did not want to give our client all the damages because Eureka was only 10 percent. Did you want to save the rest of your time? Yes, I do, Your Honor. Thank you. Good morning, and may it please the Court. My name is Jeffrey Miller of Lewis, Brisbois, Biscard, and Smith on behalf of Defendant Appalee and Cross Appellant Eureka Oxygen Company. We do have a cross appeal here. So what I'm planning on doing is spending half to three-fourths of my time relevant to responding to what counsel's remarks were just here, and as well as to address the cross appeal issue, which has to do with causation. And my reading of the record showing that there was insufficient evidence of showing a reasonable probability that what was alleged was negligence would have put out the fire in the first place. So I'll start with the initial remarks in regard to the additor, and I'm in agreement with many of the remarks made by the panel here today. Frankly, I don't think there's any remarks. I think they're all questions. So don't dump the conclusion that that's where we are. Yes. Let me ---- What evidence in the record supports the $43,000 damages? Your Honor, I'm not going to stand here and tell you that there is some witness in this record that says the damages should be $49,300. I'm not going to do that. Forty-three-nine or ---- Forty-three-nine hundred. Yes. So what are you going to tell me? What I'm going to tell you, Your Honor, is that we have to look at the record as a whole in regarding to the standard of review, which is abuse of discretion, and the discretion allotted to not only the jury and the jury involved, but the second tier, which is the district court. So we had two tiers here. We had first the jury making a determination, and then we had the district court. And what we're looking at ---- You all said, how do you get to $43,900? We get there ---- What evidence is there that gets me to $43,900?  Well, let me start with ---- let me start with really taking a look at what the job of the jury was, and I'll get right to that piece of evidence. You know, the instruction that was given to the jury as to damages, literally as to the cost of repairing the destroyed building, said that this is what the jury had to look at. It's AMCO's burden to prove the reasonable cost of repair, and they determined whether or not it was reasonable. They had to decide if it was a reasonable relationship between the cost of the repair and the harm caused by Eureka. They had to look at the expense and time involved in the restoration, and if they thought that for whatever reason the repair was not necessarily reasonable, they could award a reduction. And so what happened in this case was, as had been commented on, this was not a situation where the defendants felt that a witness showing affirmative evidence was needed, but the evidence could be shown through the testimony of the other witnesses and presented through cross-examination in particular. Ms. Russler, who was the claims adjuster, who was the individual who was making the assessment of the damages, in cross-examination, what came out was very clear to this particular jury, was that the opinion that she had was based on one bid, one bid only, not two or three where there's an average, one bid. And I think the most difficult part here for the jury was there was nothing talked about by Ms. Russler that said what was the basis or the foundation for the numbers that were given to her. She got an estimate from DCI. It was a contractor. They had numbers, but they were not explained. Where did you get the numbers? What are they based on? There was no witness from DCI, the contractor, to come in and explain what that was. Basically, what this jury was given was a piece of paper that had numbers on it and say take it or leave it. And I think the jury left. You're just presenting your argument to the jury. Get to the bottom line. How do I get to 43-9 even with all of that? I mean, I was a defense attorney, so I know where you're going, but I've got to have some way to get there. What is there in this evidence that says 43-9? How do I do it? How do I get from 689-4, which you've given me all good reasons why they shouldn't have given 689-4, come up with 43-9? I get it from the fact that the jury, first of all, did not have to believe all or part of what the witness said. But even if they didn't believe, where do they get 43-9? We had evidence, Your Honor, that was presented regarding mitigation of damages. I understand. So they're supposed to mitigate. How do I get to 43-9? Your Honor, I can't read the mind of a jury of what they determined. No, I can't either. But what they did. I can't find any figures in this evidence any place that can get me to 43-9. No place. I've got to guess. I can't say, well, there was only this much mitigation or there wasn't. I've got to find something. I can't find it. Your Honor, it was the jury's job and not necessarily the reviewing court's job at this point in the job to say what the damages were. There has to be some evidence in the record, right? That's what our cases say. Yes. There has to be some evidence. Yes. I mean, we know that the – if I remember correctly, the roof of the building caved in and the building was pretty much a total loss. Yes. You know, obviously 43-9 isn't going to do anything. So it was, like, hard to make that connection that there was any – had they awarded the total amount of damages that it wouldn't be at least close to an amount that would be reasonable to restore the building, which 43-9 is not. So I'm troubled by that disconnect, especially in the absence of any evidence in the record. That's why it looks more like a compromise that the jury was concerned. And they sent in a note to the judge saying, who pays if we find Eureka liable? Ultimately, Your Honor, I think what this is a case was involving really the burden here of proof of what needed to be shown, and the jury simply did not believe everything that was told. And how did it come up with 43-9? I can't tell you how it came up with 43-9, but we know based on this instruction given – to get it to that figure. You can't say that you somehow said, well, we can get rid of this amount of damage, and we can get rid of that amount of damage, and we can get rid of this amount of damage based on the cross-examination we did. And if you get rid of all of those damages, you get to 43-9. You can't say that. You haven't got anything that would suggest this was a minimal value. I mean, I was trying to figure out how did they hit it. And again, I think Judge Yakutas hit it. They hit it because they were doing something they couldn't under California law. Well, Your Honor, again, what this jury was considering and what it had the power to do was determine whether what was shown amounted to what it considered a reasonable showing of what the repair was. If they found that they didn't meet that burden, I think the jury had the right to do that. And as to the mitigation issue, what we were talking about there, what was below in the record was that the owner of the building had allowed grease accumulation to be on the premises, which would cause the fire to increase more than it normally would have. So there was evidence in that way as to damage that was exacerbated, and the jury was instructed on that as well. If we thought it had to go back for a new trial, can you respond to opposing counsel's suggestion that it should only be for damages and not on liability as well? Well, I think we've kind of touched around it when you're saying that maybe the jury was considering things relative to compromise. I don't – I'm not conceding that at all, but we know that the rule is that if it's inextricably intertwined between ultimately what were the damages and the potential liability, the conduct, that it should be a new trial. And that's the general rule. Well, why is it intertwined here? Because they found – they fill out the verdict form and they say 10% liability, Eureka. And the damages question is totally separate. You know, what was the extent of the damages? There was no basis for saying they didn't think Eureka was liable or is there? Well, let me go back. I think the jury instructions are very helpful here because it gives you an insight into what the jury was thinking. On the excerpts of record 88 to 89, it talks about what the jury was looking at as to, again, the repair harm. And I'll give a paraphrase for you. To determine the cost of repair, whether it's reasonable or not, the jury is to look if there is a reasonable relationship between the cost of repair and the harm caused by Eureka's conduct. That's the tie-in. To get to the point – That language is contrary to a joint and several liability type determination. I was curious about that language in the jury instruction, which seems to pull – seems more of a contributory fault or comparative fault type analysis. Is that a correct statement of California law? The jury – the record, what it shows below, is that there was some concern on the part of defense counsel about making sure the jury did understand that. And in the record, you'll find that counsel for the defense actually requested that a jury instruction be given to help the jury to clarify that. And that was objected to by plaintiff's counsel and not given. So in that way, if there is a confusion, it may have been some sort of an invited error because there was an opportunity to clarify it and it wasn't done. The other thing that I think is important to look at if you're talking about, you know, a potential compromise is if it was a true compromise, the damages amount was $718,200 that was requested. Ten percent of that is $71,820. And the jury's number was 43-9. So whether that – you would think it would be exactly the same if that were the case. Is there any California law – I know that when I was standing in your position that I really didn't want to try damages alone, and so I had to come up with some Idaho law that would suggest that the liability questions and the liability actions of the parties are necessary to determine damages. Is there anything in California that would say that? I think there is, Your Honor. I think the – and I guess that instruction that I read to you insinuates that and furthers that notion that the way to calculate and to determine, for example, here, cost of repair. We have a good case in Idaho that kind of says that really evaluating liability is a good way – one of the things that the jury can think about in determining damages. But I looked for that in California law and I didn't find the case, and so I just wondered. I think it would be logical. If this Court is inclined to request a new trial, certainly I think it would be that it would be a whole new trial. That's the conservative approach. That's the way to go if that were to happen. I'm not conceding that, of course. I don't think that we've – I think we do have sufficient grounds to affirm. I know – just remind me. I know you argued that you shouldn't be liable, but what – did you present an argument to the jury on what the damages should be? Technically, Your Honor, the argument was what Judge Smith had said, was that you're entitled to any damages because there is no liability. That was your argument? Yes. If I could, I'd like to turn to the cross-appeal with my remaining time. This is really an unusual – That was your argument to the jury? There's no damages whatsoever? That was the main argument. That $700,000, you didn't agree to that at all, or to the $600,000? Never agreed to any number, of course not, no. So you thought the building was worth nothing in terms of basically being destroyed by the fire? We thought that the burden was on the plaintiff to prove up the damages that were appropriate under the evidence. I know, and so I'm just trying to figure out if you commented at all on what you thought that was or – Not in the opening and closing. Any time during the trial, did you? I can't say, Your Honor. I'm not aware of anything in the record. On the cross-appeal, what is important in this particular case, this is unusual from a standpoint of your typical fire case. Your typical fire case, you have – the big issue is who caused the fire. And so if you can establish through experts who caused the fire, the natural extent from there is, well, the damages naturally flow from the incident of what caused the fire. What's different here is that this is not an issue of Eureka causing the fire. The argument here is that because of alleged negligent conduct, the fire that had started was not put out. That's an entirely different focus. What it raises, based on this record, in my opinion, is a real causation problem because the causation in this case was based on speculation and conjecture. What I think needs to be shown – Wait a minute before we get to speculation and conjecture. Don't you think that the real evidence here was the expert Don Perkins? Mr. Perkins did provide evidence of what he felt the cause of the fire was. And the judge didn't think that was speculation. The judge let him testify. Now, Mr. Perkins did testify, and as I understand it, he testified that the fire began in the fryer's vat of oil directly under the fire suppression system maintained by Eureka. That's correct. And then, as I understand it, there was also extensive testimony concerning the negligent maintenance of the fire system, which was maintained by Eureka. Correct, Your Honor. So at that point, I have a tough time understanding why there is no evidence, or no substantial evidence, especially when I'm looking at it in the light most favorable to AMCO, that we couldn't get to the jury. I'd have a tough time if you'd have moved for a motion for judgment on the law based on what the expert said, and the testimony is to say there is just no evidence here. Your Honor, what needed to be shown here, and again, Mr. Perkins talked about the cause of the fire, not the negligence here. That was Mr. Carlson. I didn't say it. I said what he said because I've got to string the two together. Perkins says the fire began in the fryer's vat of oil directly under the fire suppression system maintained by your client. Then, in reading the transcript, there's a lot of testimony concerning the negligent maintenance of the fire system. Here's the key. The key is that they had to show, with expert testimony, a reasonable probability that had the system been as they say it should have been, it would have put out the fire. That's the causal question, and they could not present any witness to say that, and the reason is because of the nature of fires and how they work. Fires are, by their very nature, unpredictable. Can you wrap up your overtime now? Yes, yes. Let me just cite a very few points on what Mr. Carlson said. Very, very important answer to the causal question. The ANSEL system did work. All of it came out. What they could not say was that there was no reflashing or some other ignition outside the system. What no witness said, whether, in fact, that the fire had spread outside the protected area. If the system comes out as it did, and they all said it did, no one could testify that the fire had not already spread outside the system. It could have worked perfectly and not put out the fire. In my opinion, what's required in order to sustain this judgment is some expert-provided testimony that it's more reasonably probable than not that had this been done according to what Plankton says should have been done, that the fire would have been extinguished. It doesn't seem to me there's any California case that says what you just said. You're suggesting that now we're going to say for California that there needs to be an expert as to this particular issue in every case from here on out. I couldn't find such a case, and I don't know why the jury can't then, based on the testimony of those in front of it, make a determination. If I may respond, Your Honor. The Salesworth case, the California Supreme Court, discusses the need to show reasonable probability. All I'm saying here is when it comes to the very, very difficult and complex area of fire and how they're combustible and how they spread, that a jury simply isn't capable of understanding that and making that determination without an expert saying it. And what needs to be done here – I understand your argument, so I understand the case you're citing. Thank you. Thank you, Your Honor. Just a few points. One of the other problems that we had with the case was how the jury came up with a zero verdict for loss of rents, which was $28,800. The evidence was put on, we think, without any kind of cross-examination or anything like that. And California case law says that in order to disbelieve a witness, you have to have some reason for doing it. Is it relevant that the owner said he wasn't going to rent it out once the building was restored? That's what the opposing counsel points to. I don't think he ever said that. He said that it was an investment property. And that's what they said. Well, if it's an investment property, you don't get it. It doesn't make any sense to me if it's an investment property, which is what he said. They did it for investment. You get investment properties to get loss of rents. That's exactly why he did it. He never said that he wasn't going to rent it out. So there was no evidence whatsoever to support a zero verdict. I mean, why the jury did that, we have no idea. There was no evidence to contradict what the loss of rents was. And the only thing that they came up with was, well, he said it was going to be an investment property. And the answer is, so what? The other point that I want to make is that the law is very clear that you get a new trial on damages only if there's no intertwining between liability and damages. Here there wasn't any. The damage issues, Sean Ressler and the building owner, had nothing to do with liability. The liability issues had nothing to do with damages. It wasn't mentioned at all how it applied to damages. Therefore, we believe. What do I do with that line from the instructions to determine whether the cost of repairing the harm is reasonable? You must decide there's a reasonable relationship between the cost of repair and the harm caused by Eureka's conduct. What do I do with that? Is that a correct statement of California law? And the opposing counsel says it was an invited error. Well, I don't think there's anything wrong with that. I think there has to be some relationship, but I think there was clearly a relationship here. And I don't think that the jury came up with the 48 for their figure by using that instruction and said, okay, well, we're going to reduce it. But anyway, once again, getting back to the why I think one of the key issues on this appeal is whether if your honor is going to grant a new trial, whether it should be liability. I think the liability issue was very clear. I don't think they've come up with anything on the liability issue. Why should we have to go back with the liability issue when it's so clear the liability issue and the damages had nothing to do with it? We think if you're going to reverse it, it should be on damages only, which I think is clearly erroneous. Thank you. We thank both sides for their argument. In the case of Amco Insurance Company, the Eureka Oxygen Company has submitted.
judges: Ikuta, Smith, Murguia